UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 537 |
| v. | ) | |
| | ) | The Honorable Gary Feinerman |
| BRIAN HOWARD | ) | |

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S SENTENCING MEMORANDUM

Brian Howard committed a violent crime that put lives at risk. His motive was retribution against an employer he deemed wasteful and incompetent and government workers he labeled lazy and useless. He acted willfully. He was not just aware of the consequences of his actions; he intended them.

Defendant offers three primary arguments to support his proposed sentence. None supports a finding of reckless endangerment. None justifies a sentence of a single day in prison for defendant's willful destruction of an air navigation facility.

First, defendant argues that he did not mean to hurt anyone but himself. That is not the legal standard. Intentional endangerment does not require an intent to hurt another person or even actual harm. It requires an intent to create a dangerous situation either at a mass transportation facility or for an aircraft. Defendant intended both.

Second, defendant contends he did not realize his actions would have such severe consequences. But the degree of severity is irrelevant. Defendant intended to create the consequences that resulted in endangerment. He attacked the Chicago

Center's most vulnerable location to cause a complete communication outage. The fact that the outage lasted longer than defendant claims he had hoped does not lessen his culpability, or somehow make his conduct reckless.

Finally, defendant notes that he generally is a "good person" who does not deserve an additional prison sentence on Count One. (Def. Sent. Memo. 1.) Defendant's history and characteristics are factors the Court should consider in fashioning a sentence, but they do not absolve him from punishment on Count One.

## ARGUMENT

### I. THE PROPER LEGAL STANDARD

Defendant starts from the premise that his endangerment was reckless because he never intended to harm anyone but himself. (Def. Sent. Memo. 4-6.) That is not the law. In *United States v. Mendoza*, 244 F.3d 1037, 1042-44 (9th Cir. 2001), the court held that the term "endanger" was broad enough to "cover cases where ***no specific injury was done or intended***, but only a dangerous condition created." *Id.* (citation omitted) (emphasis added); *see also* Gov't Sent. Memo., at 23-25 (citing cases). The relevant question for purposes of Section 2A5.2 is whether defendant intended "to create a dangerous situation," or intended "to bring into danger of probable harm or loss." *Id.* at 1042. The evidence is unequivocal that he did.

### II. DEFENDANT INTENDED THE CONSEQUENCES OF HIS ACTIONS (OBJECTIVE EVIDENCE OF DEFENDANT'S SUBJECTIVE INTENT)

The parties may disagree about what inferences to draw regarding defendant's subjective intent, but the objective facts are not in dispute. Numerous

sources of evidence, including defendant's guilty plea, the deliberate and calculated nature of his actions, and even his own words, prove that defendant intended to create a dangerous situation at the Chicago Center, intended to cause probable harm or loss at the Chicago Center, and intended to cut off all communications with airplanes within the Chicago Center's airspace. Each is sufficient to support a finding of intentional endangerment.

In assessing this issue, it is important to start with the crime to which defendant pled guilty.

### A. Defendant Willfully Committed a Violent Crime, Not a Simple "Property Crime"

Defendant contends he "committed a property crime." (Def. Sent. Memo. 12; *see also id.* 13 n.10.) That is not the case. Defendant pled guilty to a violent crime. He admitted willfully setting fire to, damaging, destroying, *and* disabling the Chicago Center. *See* Dkt. No. 29, Information, May 4, 2015. He also admitted willfully interfering **by force and violence** with the operation of that facility. *Id.* This was not a simple property crime.

An accurate characterization of the offense is important. It highlights the difference between reckless and intentional endangerment. In each of the cases finding reckless endangerment under Section 2A5.2, the defendant was convicted of interfering with a flight crew member in violation of 49 U.S.C. § 46504 or one of its predecessor statutes.[1] That statute has no intent element.[2] Thus, while defendant

---

[1] *United States v. Spellman*, 243 F. Supp. 2d 285, 286 (E.D. Pa. 2003), also included charges for "simple assault" in violation of 49 U.S.C. § 46506, but they did not alter the court's analysis of the Section 2A5.2 issue.

in this case acted willfully, the defendants in the reckless endangerment cases did not (and did not even act intentionally).

The crime of conviction should end the discussion of whether defendant's endangerment was intentional or reckless. Defendant pled guilty to willfully disabling and destroying an air navigation facility. To "disable" means to incapacitate, or to destroy something's capabilities. *See Henning v. Colvin*, 943 F. Supp. 2d 969, 994 (N.D. Ia. 2013) (citing Miriam-Webster Online Dictionary); 18 U.S.C. § 33(a) (prohibiting disabling or incapacitating the driver of a motor vehicle). A defendant who willfully incapacitates or destroys the capabilities of an air navigation facility—the very facilities responsible for safely guiding planes through the air—necessarily creates a dangerous situation for the airplanes for which that facility is responsible.

### B.   Defendant's Motive Proves His Subjective Intent

Defendant's motive is another key indicator of whether he intended to create a dangerous situation. It shows defendant wanted to lash out at his employer (or create a danger of probable harm or loss for them). In defendant's own words:

- Defendant attacked the Chicago Center because he was "angry about his former employer." (Conroe Report 2)

---

[2] Section 46504 provides: "An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both. However, if a dangerous weapon is used in assaulting or intimidating the member or attendant, the individual shall be imprisoned for any term of years or for life."

- Defendant "decided that he would strike out at his employer in the process of killing himself." (Conroe Report 6)

- Defendant "intended the cutting of the wires to prompt an investigation, leading to the company being 'hung out to dry.'" (Conroe Report 7)

- Defendant "cut wires and started a small fire to cause problems for his employer." (Conroe Report 8)

- Defendant "accused his superiors of stealing from the American public." (Conroe Report 8)

- Defendant was "upset with management and he ended up doing more than his fair share of work." (Conroe Report 8)

- Defendant's "goal was to draw attention to his plight with his employer through his death and his actions." (Conroe Report 10)

- Defendant "planned to cause an outage at the Aurora facility to bring attention to what he saw as the wastefulness and incompetence of" his employer. (Def.'s Version of the Offense, at 6)

- Defendant believed "we deserve retribution from people who do not have the same ability for education, work and way of life. Take a hard look in the mirror. I have. And this is why I am about to take out ZAU and my life." (Govt. Sent. Memo. at 8) (citing defendant's Facebook post)

Defendant's own Sentencing Memorandum illustrates the importance of his admitted motive, and why it is fatal to his sentencing argument. Defendant acknowledges that "[h]ad this been an act of sabotage motivated by some malicious intent, the just punishment would be a significant period of incarceration." (Def. Sent. Memo. 12) That is exactly what defendant's crime was: an act of sabotage motivated by retributive intent. Defendant may not have intended to inflict mass casualties or cause an airplane to crash. But he did intend to cause harm and loss, and he did intend to disable communications, because he was upset with his employer.

5

## C. The Targeted and Deliberate Nature of the Attack Proves Defendant's Subjective Intent

Perhaps the strongest evidence that defendant's endangerment was intentional is the targeted, pre-meditated, and deliberate nature of his crime. Defendant attacked a precise location within the Chicago Center. In a 14,000 square foot basement, defendant cut the wires where the primary and backup telecommunications systems converged. *See* Govt. Sent. Memo. 9-14. He bypassed row after row of other telecommunications equipment, and severed the wires he knew would "effectively shut down the Control Center," and prevent controllers from communicating with airplanes. Plea Agreement ¶ 6. He then lit those wires on fire to make a quick repair impossible.

Defendant tries to avoid the consequences of these undisputed facts by minimizing the severity of his conduct based on defendant's claimed (but unsubstantiated) subjective beliefs:

- "Brian believed that the fire he started . . . would be small." (Def. Sent. Memo. 6 n.4) Yet he used gasoline as an accelerant.

- Brian believed "the increased risk [to airplanes] would be miniscule" (*Id.* at 7) Yet he knew his actions would increase the risk to airplanes and would prevent them from communicating with air traffic controllers. *See* Plea Agreement ¶ 6.

- Brian intended to "cause a small outage." (Def.'s Version of the Offense, at 1) Yet he completely disabled, by targeting a precise location, both the primary *and* backup telecommunications backbone at the Chicago Center, effectively shutting it down.

- Brian "expected a few planes to be in flight." (Def.'s Version of the Offense, at 1) Yet he chose to act when he knew planes would be in the air, and he was still willing to put those flights at risk to make a statement to his employer.

6

The objective evidence does not support defendant's characterization of his crime. While there is no evidence to suggest defendant intended to cause a plane crash or other harm to airplane passengers, intentional endangerment does not demand such evidence. *See United States v. Bocook*, No. 94-5344, 1995 U.S. App. LEXIS 15514, at *5 (4th Cir. Jun. 21, 1995) (unpublished) (finding intentional endangerment even though "there [was] no evidence in the materials presented on appeal to suggest that [defendant's] objective was to cause a plane crash or other harm to an aircraft or passengers").

## D. Defendant Admitted that He Knew of and Intended the Consequences of His Actions

Defendant's own words also establish intentional endangerment. As discussed above, defendant pled guilty to willfully disabling and destroying an air navigation facility. Since being charged, defendant has repeatedly admitted that he understood his actions' consequences and intended those consequences to occur:

- Defendant "knew [his actions] would affect FAA and air traffic," and "pilots' ability to communicate." (Conroe Report 6)

- Defendant "intentionally severed multiple telecommunications cables that enabled the Control Center to communicate with the outside world and with other FAA facilities." (Plea Agreement ¶ 6)

- Defendant knew his conduct "increased the risk to aircraft traveling through the Control Center's air space." (*Id.*)

- Defendant knew that air traffic controllers in the Control Center would be unable to communicate with aircraft that were in the air. (*Id.*)

- Defendant knew that air traffic controllers would be unable to use radar technology to assist aircraft in safely navigating through the Control Center's air space. (*Id.*)

Defendant may not have known how many planes were in the air, or how long the outage would have lasted. But a defendant need not intend *every* consequence resulting from his crime. So long as he intended a consequence that endangers a mass transportation facility or an aircraft, intentional endangerment exists.

## III.   DEFENDANT'S REMAINING ARGUMENTS DO NOT TURN HIS INTENTIONAL CONDUCT INTO RECKLESS CONDUCT

### A.   Defendant's Claim That He Could Have Done More Damage, or Committed a More Severe Crime, Does Not Alter the Analysis

Defendant claims that the Court should not find his endangerment intentional because (1) he had access to O'Hare and Midway airports and could have attacked planes that were taking off and landing if he really wanted to put them in danger, and (2) he had access to the Chicago Center at peak hours and could have attacked the facility when even more planes were in the air. (Def. Sent. Memo. 4-5) In other words, defendant claims his crime could have been a lot worse.

The suggestion that defendant made the conscious decision to attack the Chicago Center, as opposed to O'Hare or Midway, to minimize the potential impact on airplanes does not merit further discussion. The only conscious decision supported by the factual record is that defendant targeted a precise location within the Chicago Center, disabled both the primary and backup telecommunications systems, and shut down the facility to make a statement to his employer.

What *does* merit further discussion are the factual inaccuracies underlying defendant's claim that he made rational, calculated decisions about the timing and location of his crime in order to lessen its impact. There are at least four such errors.

8

First, contrary to his claim, defendant did *not* have the same access to O'Hare and Midway that he had at the Chicago Center. (*See* Ex. A, Report of Interview with M. Paulsen, Aug. 27, 2015.) FAA personnel would have to escort defendant at those facilities if he wanted to access his employer's equipment. He would not have been able to attack O'Hare or Midway in the same way he attacked the Chicago Center because other employees would necessarily be present.

Second, defendant could not have disabled the air traffic control systems at O'Hare and Midway in the same way he did at the Chicago Center. Those towers communicate with pilots in a different way than the Chicago Center. Their communications do not even use the FTI. More importantly, they have emergency radio transceivers at each tower that allow air traffic controllers to communicate with airplanes via wireless radio in case of a shutdown of the primary and backup systems. (*Id.*) In contrast, defendant disabled all communication capability at the Chicago Center, and he did so intentionally.

Third, defendant's claim that he made the conscious decision *not* to endanger airplanes during "taking off and landing, which are the most critical phases in a flight," is also wrong. There are at least nine airports where the Chicago Center is responsible, at various times of the day, for communicating with and guiding airplanes during take-off and landing.[3] At the time of defendant's attack, such planes were in the air. (*Id.*) Thus, defendant's conduct directly impacted airplanes

---

[3] Some airports do not have overnight controllers on site, and others do not have controllers onsite at all because of their size. The Chicago Center handles all take-off and landing responsibilities for these airports when controllers are not present.

that, in defendant's own words, were in "the most critical phases in a flight." (Def. Sent. Memo. 4-5)

Finally, defendant's claim that he made the conscious decision to "act[] at the least busy time of day, when plane traffic was at its lowest" is wrong. (*Id.* at 4.) There were other times of the day, such as the middle of the night, when there would be fewer planes in air. (*Id.*) Defendant did not consciously pick a time of day that would have the least impact; he consciously picked a location to attack that would have the greatest impact.

## B. Defendant's Claimed Belief in an Automatic Communication Transfer Does Not Support a Finding of Recklessness

Pointing to his Facebook post, defendant argues that although he willfully disabled the facility (and intended to shut down its ability to communicate), he subjectively believed "all comms should be switched to the alt location" in a relatively short period of time. Even accepting defendant's subjective belief as true, it does not support a finding of reckless endangerment.

In analogous situations, courts have recognized that forcing an airplane to rely on a backup system or contingency plan increases the risk to—and therefore endangers—the aircraft. Thus, if a defendant *intends* to take out a primary safety function (or here, the primary *and* backup safety functions), intentional endangerment occurs.

For example, in *United States v. Guerrero*, 193 F. Supp. 2d 607, 609 (E.D.N.Y. 2002), the court held that a defendant who caused the captain to leave the cockpit "increased the risk to the safety of the aircraft, which is designed to be flown by two

10

pilots." Similarly, in *United States v. Poe*, No. 99-50090, 2000 U.S. App. LEXIS 6816, at *3 (9th Cir. Apr. 11, 2000), the court held that a defendant's conduct that "caused the second officer, who is responsible for many safety functions aboard the aircraft, to leave the cockpit area . . . placed the plane and its passengers in danger." And in *United States v. Clarkson*, Case No. 04-1520, 2005 U.S. App. LEXIS 18936, at *10-11 (6th Cir. Aug. 25, 2005), the court held that diverting a flight crew's attention, together with other conduct, was sufficient to support a finding of endangerment because those individuals are responsible for maintaining the airplane's safety. *Id.* ("The professionals who were supposed to be ensuring a safe flight were--at least part of the time--busy dealing with [defendant's] angry antics.").[4]

In this case, defendant willfully disabled ***both*** the Chicago Center's primary and backup communication capabilities. (*See* Govt. Sent. Memo. at 9-14.) If defendant wanted to send a message to his employer, he could have disabled the primary system, leaving the backup intact and causing no harm to the nation's air space. But that is not what he wanted. He wanted to shut down the Chicago Center in its entirety, forcing the system, in his mind, to resort to the backup to the backup.[5]

---

[4] These cases involved reckless endangerment, but only because the defendants did not intend, or set out to cause, the endangerment. The opposite is true here.

[5] If the Court accepted defendant's argument about the "alt location," there could never be intentional endangerment in situations where a backup system existed. A defendant could always argue that he did not intend to create a dangerous situation because there were contingencies in place to mitigate any potential harm or loss. The cases cited above reject that position.

In sum, defendant's claimed belief in a communication transfer that never happened (and could not happen) does not make his endangerment reckless.

IV. **A Sentence of Three Years on Count One is Sufficient, But Not Greater Than Necessary, to Achieve the Goals of Sentencing**

A. **Defendant's History and Characteristics Do Not Overcome All of the Other Sentencing Factors to Justify a Sentence of a Single Day in Prison for Count One**

Defendant argues that he should receive a lenient sentence on Count One because he is a "good person." (Def. Sent. Memo. 1) The United States does not disagree with defendant's mitigating evidence (other than the disagreements regarding defendant's subjective beliefs). But the existence of mitigating evidence should not change how the Court analyzes defendant's criminal conduct. Instead, defendant's history and characteristics are factors the Court should consider in fashioning an appropriate sentence. That is what the United States' and the Probation Officer's sentencing recommendations do.

B. **The Sentence Recommended by the United States Accounts for Defendant's History and Characteristics**

Both the United States and the Probation Officer recommended a sentence of 36 months' imprisonment on Count One. These recommendations take into account defendant's history and characteristics, including his lack of prior criminal history, honorable military service, prior work performance, supportive family, and his attempt to end his own life. The sentencing recommendations also take into account the mandatory term of imprisonment defendant will receive on Count Two. All of these facts support a downward variance from the advisory Guideline range of 87-

108 months, but they do not support what amounts to no punishment at all on Count One.

In contrast, defendant's recommended sentence does not take into account sentencing factors the Court is required to consider pursuant to 18 U.S.C. § 3553(a). It disregards the nature and circumstances of the offense (a violent crime with widespread consequences), the need for the sentence to provide just punishment (something that a sentence of one day does not accomplish with respect to Count One), and the need for the sentence to afford adequate deterrence (a particularly important factor given the unique role the Chicago Center plays in the safety of our national infrastructure). A sentence of one day in prison for the crime of willful destruction of an air navigation facility promotes none of these required sentencing considerations.

## CONCLUSION

For each of the foregoing reasons, the United States respectfully requests that the Court (1) hold that defendant intentionally endangered a mass transportation facility and aircraft; (2) sentence defendant to 36 months' imprisonment on Count One; (3) impose the mandatory, consecutive 10-year sentence on Count Two; (4) order restitution to the Federal Aviation Administration in the amount of $4,502,361; (5) require defendant to pay the $200 mandatory special assessment pursuant to 18 U.S.C. § 3013 ($100 for each count of conviction); and (6) impose conditions of supervised release as set forth in the Pre-Sentence Report.

13

Dated: September 4, 2015       Respectfully submitted,

                           ZACHARY T. FARDON
                           United States Attorney

By:    /s/ Andrew K. Polovin
            Andrew K. Polovin
            Assistant United States Attorney
            United States Attorney's Office
            219 South Dearborn Street
            Chicago, Illinois 60604
            (312) 353-5351

14

## CERTIFICATE OF SERVICE

I, Andrew K. Polovin, hereby certify that on September 4, 2015, I caused a copy of the foregoing to be served in accordance with Fed. R. Crim. P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Andrew K. Polovin
ANDREW K. POLOVIN
Assistant United States Attorney
U.S. Attorney's Office
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
312.353.5351
andrew.polovin@usdoj.gov